# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEANETTE COSTOSO, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br><br>Defendant. | Civil Action No. _____ |

## <u>CLASS ACTION COMPLAINT</u>

**TABLE OF CONTENTS**

**Page No.**

INTRODUCTION ................................................................................................ 1

THE PARTIES................................................................................................... 4

JURISDICTION AND VENUE ............................................................................ 5

COMMON FACTUAL ALLEGATIONS ............................................................... 6

A.  New York Laws Banning Payday Loans .......................................... 6

B.  BofA's Standard Account Agreement ............................................... 6

C.  New York State Provided BofA With Specific Information Regarding
    Certain Illegal Payday Lenders, and BofA Ignored It ...................... 9

D.  BofA Actively Monitors ACH Transactions And Was Aware Of Illegal
    Payday Loan Activity ...................................................................... 10

E.  Pursuant to NACHA Rules, BofA Monitors Its Accounts for Illegal Activity ............... 12

F.  The ACH Network Provided BofA With Sufficient Information To Identify Illegal
    Payday Lenders and Loans ............................................................ 13

G.  State and Federal Regulatory Agencies, Public Records, And Media Reports Alerted
    BofA To The Illegal Payday Lenders Unlawful Activities Across
    The Country And In The State Of New York ................................... 16

H.  Bank of America Has Significant Financial Interests In Making Sure That
    The Payday Lending Industry Is Successful And Profitable ........... 19

I.  Plaintiff Jeanette Costoso's Internet Payday Loans........................ 22

CLASS ACTION ALLEGATIONS ..................................................................... 27

FIRST CLAIM FOR RELIEF
BREACH OF CONTRACT................................................................................ 29

SECOND CLAIM FOR RELIEF
BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING ......................... 30

THIRD CLAIM FOR RELIEF
UNCONSCIONABILITY .................................................................................. 31

FOURTH CLAIM FOR RELIEF
CONVERSION................................................................................................ 32

FIFTH CLAIM FOR RELIEF
UNJUST ENRICHMENT (IN THE ALTERNATIVE) .............................................. 34

i

SIXTH CLAIM FOR RELIEF
VIOLATION OF NEW YORK GBL §§ 349 *ET SEQ.* ............................................................. 35

PRAYER FOR RELIEF ............................................................................................................ 36

Plaintiff, Jeanette Costoso, through undersigned counsel, on behalf of herself and all persons similarly situated, allege the following based on personal knowledge as to allegations regarding the Plaintiff and on information and belief as to other allegations.

## **INTRODUCTION**

1.     This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief from Defendant, Bank of America, N.A. ("BofA" or the "Bank"), arising from BofA's processing debits on its customers' bank accounts ("account" or "deposit account") from payday lenders it knew were making unlawful payday loans in New York.

2.     Payday loans are short term high interest loans for small amounts of money that typically come due in a matter of days or weeks and require the borrower to provide the payday lender with access to their deposit account for repayment.  However, payday loans are typically made without any consideration of the borrower's ability to repay and because of the extremely high interest costs (ranging anywhere from 400% to more than 1000%, in most cases) the borrower is forced to "renew" or "rollover" the debt.  This results in interest-only payments where the principal is difficult to pay off and additional fees.  Accordingly, because of the manner in which payday loans are structured and the exceedingly high costs of interest and fees, most borrowers become ensnared in debt traps and end up in a much worse financial position than if they had never taken out the loans in the first place.

3.     As a result of these "debt traps" and the unconscionable nature of these loans, at least fourteen jurisdictions across the nation have either banned payday loans directly or effectively banned them by operation of an interest rate cap.  Payday loans are illegal in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia, and the District of Columbia.

4.      Many unscrupulous payday lenders (often based offshore or purportedly based on Native American reservations in an attempt to avoid application of American laws) make use of the Internet to circumvent these jurisdictions' prohibitions and directly offer payday loans to consumers (the "Illegal Payday Lenders"). These loans ("Illegal Payday Loans") feature crushing interest rates and other illegal terms.

5.      Illegal Payday Lenders' ability to defy state law hinges on the cooperation of financial institutions like BofA — which process Illegal Payday Loan debits and credits on their account holders' deposit accounts — providing Illegal Payday Lenders the access to the mainstream electronic payment system that is their lifeblood.

6.      The mainstream electronic payments system, which provides individuals and businesses (including Illegal Payday Lenders) access to electronic debits and deposits to consumer deposit accounts, is called the "Automated Clearing House" or "ACH Network." The ACH Network is the backbone for the electronic movement of money and data in the United States.  BofA and other financial institutions tasked with making debits or credits on their customers' deposit accounts are known, in ACH Network terminology, as Receiving Depository Financial Institutions ("RDFIs").

7.      NACHA (previously the National Automated Clearing House Association) manages the development, administration, and governance of the ACH Network.  The NACHA Operating Rules are an extensive set of rules and regulations that govern and provide ACH Network participants with the legal framework for the ACH Network.  The NACHA Operating Guidelines provide guidance on implementing the Operating Rules (the Operating Rules & Guidelines are collectively referred to herein as "NACHA Rules").  The introduction to the NACHA Rules states that the rules "serve[] as the definitive source of information governing the

exchange and settlement of electronic fund transfers through the ACH Network."

8.     The NACHA Rules specifically require all parties involved in the processing of ACH transactions to adhere to *all* state and federal laws in the United States.  These requirements are meant to keep illicit and unlawful transactions out of the ACH Network.

9.     That is why the State of New York has specifically urged BofA to stop processing Illegal Payday Loan transactions for loans issued by Illegal Payday Lenders used by the Plaintiff and the Class.  Yet BofA continued to knowingly process Illegal Payday Loans, despite this specific knowledge and warning, harming Plaintiff and the Class.

10.     BofA's contracts with its customers also require it to adhere to the NACHA Rules.  Thus, when BofA debits its customers' deposit accounts for Illegal Payday Loans it not only violates the NACHA Rules, but also its contractual agreements with its customers.

11.     Indeed, it would be impossible for Illegal Payday Lenders to deposit payday loan proceeds or debit payday loan payments from customers' deposit accounts in jurisdictions where the loans are illegal without BofA's willingness to debit its customers' deposit accounts for Illegal Payday Loans.

12.     BofA knows and can easily identify Illegal Payday Lenders and Illegal Payday Loan debits and deposits.  ACH entries clearly identify the merchant requesting payment.  In August, 2013, BofA was provided with the identities of 35 Illegal Payday Lenders by the New York State Department of Financial Services ("DFS").  In addition, Illegal Payday Loan debits exhibit a unique pattern of activity on customers' deposit accounts and the ACH Network itself provides important information regarding Illegal Payday Lenders.

13.     Moreover, BofA maintains an in-house, high-tech transaction surveillance software system and employs a large transaction monitoring employee group to identify

3

suspicious or potentially unlawful transactions.  These in-house systems alerted BofA of the illegal activity at issue in this suit.

14.     In the face of this information, however, BofA continues to knowingly permit Illegal Payday Lenders to access its New York customers' deposit accounts.

15.     Because BofA repeatedly processed transactions initiated by Illegal Payday Lenders, BofA repeatedly collected illegal and usurious loan repayment debits from Plaintiff and the Class members' BofA deposit accounts.  These illegal debits, in many instances, also caused a cascade of bank fees, further burying the Plaintiff and the Class members in massive holes of debt.  These revenue-generating fees are a primary motivation for BofA's conduct.

## THE PARTIES

16.     Plaintiff Jeanette Costoso ("Costoso") is a citizen and resident of New York and resides in the Incorporated Village of Rockville Centre, Town of Hempstead, County of Nassau. Plaintiff lives in a jurisdiction where payday loans are illegal but was offered loans by Mambo Cash, North Star Finance, LLC d/b/a North Cash ("North Cash"), GTI Holdings Payday Loans ("GTI Holdings"), United Holdings Group LLC ("United Holdings"), Hydra Financial Limited Fund II ("Hydra Fund"), and Mass Street Group ("Mass Street").  Costoso is a banking customer of Defendant BofA.   As described more fully herein, BofA improperly and illegally processed debits from Costoso's account related to her Illegal Payday Loans.

17.     Defendant Bank of America, N.A. is a federally chartered national banking association headquartered in Charlotte, North Carolina.  Among other things, BofA is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative Class.  BofA operates more than 5,000 banking centers and conducts business in various jurisdictions, including New York.

## JURISDICTION AND VENUE

18.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed Class is a resident of a different state than BofA.

19.     This Court has personal jurisdiction over BofA pursuant to New York Civil Practice Laws and Rules 301 in that BofA has engaged in a continuous and systematic course of doing business in the State.  Alternatively, this Court has personal jurisdiction over BofA pursuant to New York Civil Practice Laws and Rules § 302(a)(1) in that BofA transacts substantial business in the State of New York and contracts to supply services in the state. Alternatively, this Court also has personal jurisdiction over BofA pursuant to New York Civil Practice Laws and Rules §§ 302(a)(3)(i) and (ii) in that BofA personally or through an agent committed torts outside the State of New York, causing injury to persons within the State of New York, and should have reasonably expected its tortious acts to have consequences in the State of New York and also derives substantial revenue from services rendered in the State of New York or derives substantial revenue from interstate or international commerce.

20.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391 because BofA is subject to personal jurisdiction here, because a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in that district, and because BofA has caused harm to one or more plaintiffs residing in this District.

## COMMON FACTUAL ALLEGATIONS

**A.** **New York Laws Banning Payday Loans**

21.     Payday loans are unlawful in New York.

22.     New York Banking Law § 14-a, subdivision 2, states that the maximum rate of interest to be ***charged, taken, or received*** upon a loan or forbearance of any money, goods, or things in action is sixteen percent per annum (16%) (emphasis added).

23.     Pursuant to New York Penal Law § 190.40 it is unlawful to knowingly charge, take, or receive any money or other property as interest on the loan or forbearance of any money or other property at a rate exceeding twenty-five per cent per annum (25%) or the equivalent rate for a longer or shorter period.

24.     BofA has repeatedly "charged, taken or received" monies for repayment of Illegal Payday Loans that equate to interest significantly in excess of 16%, and often in excess of 25%.

25.     New York law makes Illegal Payday Loan debts unenforceable, but BofA's conduct enforced them to the detriment of Plaintiff Costoso and the Class.

**B.** **BofA's Standard Account Agreement**

26.     Costoso and members of the Class currently hold, or formerly held, deposit accounts at BofA. The terms of BofA's deposit accounts are contained in a standardized agreement (the "Account Agreement").

27.     The Account Agreement is attached as Exhibit A hereto. On information and belief, as to the terms at issue, the Account Agreement was substantially the same throughout the Class Period.

28.     In relevant part, the Account Agreement requires customers to acknowledge and agree that BofA is subject to the NACHA and ACH Rules.  The Account Agreement states: "From time to time, originators that you authorize may send automated clearing house (ACH)

credits or debits for your account. For each ACH transaction, you agree that ***the transaction is subject to the National Automated Clearing House Association (NACHA) Operating Rules and any local ACH operating rules then in effect"*** (emphasis added).

29.     BofA therefore incorporated NACHA Rules into its standardized Account Agreement, creating a contractual duty to customers to adhere to the NACHA Rules.

30.     Pursuant to the NACHA Rules, BofA had the due diligence and risk-based monitoring duties and obligations that are described below.  These duties required it not to process activity and debits from entities known to engage in unlawful activities, such as the Illegal Payday Lenders or their third party payment processors.

31.     The NACHA Rules also provide BofA with the authority to block transactions it knew were initiated by Illegal Payday Lenders.

32.     When reasonable due diligence and risk-based monitoring results in knowledge of unlawful activity, the NACHA Rules require RDFIs to prohibit or refuse to process those transactions.

33.     The NACHA Rules provide that an RDFI "must accept Entries that comply with these Rules and are received with respect to an account maintained with that RDFI, ***subject to its right to return Entries under these Rules***."[1]

34.     The NACHA Rules provide that "[a]n RDFI ***must*** recredit the accountholder for a debit Entry that was, in whole or in part, not properly authorized under these Rules, as required by these Rules, applicable Legal Requirements, or agreement between the RDFI and the accountholder."[2]  "Legal Requirements" are defined as "any law, statute, rule or regulation, or any binding published interpretation of any of the foregoing, issued by any government authority

---

[1] NACHA Rule 3.1-3.1.1 (emphasis added).
[2] NACHA Rule 3.11.

(including courts), and any judicial, governmental, or administrative order, judgment, decree or ruling . . ."[3]

35.     BofA's decision to process ACH debit entries that were in violation of the applicable "Legal Requirements," including the laws of New York, obligated BofA to re-credit the accounts of its customers it wrongfully debited for Illegal Payday Loans.

36.     With regard to debit entries from consumer accounts (such as those that represent loan repayments to Illegal Payday Lenders), an authorization that is "otherwise invalid under applicable Legal Requirements does not satisfy the requirements" of an "authorization" under the NACHA Rules.[4]

37.     Indeed, the Account Agreement also provided BofA with the authority to block transactions initiated by Illegal Payday Lenders.  It states: "If at any time we believe that your account may be subject to irregular, unauthorized, fraudulent, or illegal activity, we may, in our discretion freeze the funds in the account and in other accounts you maintain with us, without any liability to you, until such time as we are able to complete our investigation of the account and transactions."  In the case of the Illegal Payday Loan transactions described herein, however, BofA used this contractual authority to approve and process Illegal Payday Loan transactions.

38.     Also in violation of the Account Agreement, BofA charged bank overdraft and/or returned item fees as a result of unlawful Illegal Payday Loan debits.

39.     The Account Agreement does not authorize, expressly or impliedly, BofA to assess overdraft and/or returned item fees generated as a result of illegal and unenforceable transactions such as the Illegal Payday Loan transactions it had the contractual obligation not to process.

---

[3] NACHA Rule 8.49 (emphasis added).
[4] NACHA 2013 Operating Rules Section 2.3, Subsection 2.3.2.3(b), p. OR6.

40.     BofA repeatedly processed Illegal Payday Loan transactions, despite NACHA Rules requiring the bank to monitor for and reject such transactions.  By doing this, BofA increased the amount of overdraft and/or returned item fee revenue it could gain from its customers.

## C.     New York State Provided BofA With Specific Information Regarding Certain Illegal Payday Lenders, And BofA Ignored It

41.     On August 5, 2013, New York's DFS, which supervises banking and financial institutions in the State of New York, sent letters to 117 banks, including BofA, urging these banks to block online lenders from debiting their customers' deposit accounts.  DFS specifically informed NACHA and these banks of the identities of 35 such Illegal Payday Lenders that may attempt to use banks as conduits for illegal conduct.[5]

42.     The letter informed BofA that "[t]he Department has uncovered dozens of out-of-state lenders that have used the Internet to solicit and provide illegal payday loans to consumers in New York."[6]

43.     It went on to explain that in order "[t]o address this unlawful activity, DFS [ ] sent letters to 35 payday lenders directing them to cease and desist offering to lend and lending monies at usurious rates in New York."[7]

44.     The letter also stated, "Banks have proven to be . . . an essential cog in the vicious machinery that these purveyors of predatory loans use to do an end-run around [the] law."[8]

---

[5] Letter from Benjamin M. Lawsky to Janet O. Estep, President and CEO of NACHA, *Illegal Online Payday Loans Offered and Sold to New York Consumers* (Aug. 5, 2013), http://www.dfs.ny.gov/about/press2013/pr130806-link2.pdf; Press Release, *Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans that Harm New York Consumers* (Aug. 6, 2013), http://www.dfs.ny.gov/about/press2013/pr1308061.htm.
[6] *Id.*
[7] *Id.*
[8] *Id.*

45.     The DFS letter informed BofA of the identities of 35 Illegal Payday Lenders that were sent cease and desist orders, however, BofA continued to process Illegal Payday Loan debits associated with these companies.

**D.      BofA Actively Monitors ACH Transactions And Was Aware Of Illegal Payday Loan Activity**

46.     Due to various obligations under federal law, NACHA Rules, and ACH Network rules, BofA is actively engaged in monitoring its ACH transaction flows for unlawful transactions and transactions initiated by merchants known or suspected to be engaged in illegal activities.

47.     Pursuant to federal statutes and regulations, BofA is obligated to have effective procedures to prevent entities engaged in unlawful activity from accessing the national banking system. BofA is required to acquire information sufficient to know the true identities of the entities to which it provides access to the national banking system, as well as the nature of their business activities.

48.     For example, BofA, like all banks in the United States, is required by law to have an effective program in place to assure that it understands the identities of its merchants and the nature of their business activities.  Similarly, BofA is required to have an effective compliance program to prevent illegal use of the banking system by the Bank's merchants.[9]

49.     The Office of the Comptroller of the Currency ("OCC"), which regulates national banks, has specifically counseled banks to maintain a high awareness for potential illegal activity.

50.     On September 1, 2006, the OCC provided guidance for all national banks and

---

[9] *See generally* Bank Secrecy Act, 31 U.S.C. § 5311 et seq.; USA Patriot Act, § 326, 31 U.S.C. § 5318; 31 C.F.R. § 1020 *et seq.* (formerly 31 C.F.R. § 103 *et seq.*).

examiners on managing the risks of ACH activity, explaining that "[n]ational banks may be exposed to a variety of risks when originating, receiving, or processing ACH transactions, or outsourcing these activities to a third party."[10]  The OCC guidance advised:

> **High-Risk Activities**
>
> Banks that engage in ACH transactions with high-risk originators or that involve third-party senders face increased reputation, credit, transaction, and compliance risks. High-risk originators include companies engaged in potentially illegal activities or that have an unusually high volume of unauthorized returns.
>
> Before a bank engages in high-risk ACH activities, the board of directors should consider carefully the risks associated with these activities, particularly the increased reputation, compliance, transaction, and credit risks. The board should provide clear direction to management on whether, or to what extent, the bank may engage in such ACH activities. ***Some banks have established policies prohibiting transactions with certain high-risk originators and third-party senders***.[11]

51.     In a footnote to the guidance, the OCC made the risk to banks even clearer: "Risks may include the risk of legal liability or damage to an institution's reputation when originators or third-party senders facilitate or engage in activities that violate criminal laws."[12]

52.     Moreover, as discussed below, the ACH Network (of which BofA is a member) has had, at all relevant times, its own requirements for risk-based transaction monitoring and due diligence.  The ACH Network also provided BofA additional information with which to identify transactions initiated by Illegal Payday Lenders.

53.     It is for all these reasons that BofA maintains a sophisticated in-house transaction monitoring operation, utilizing dedicated technology and staffing focused on transaction

---

[10] OCC Bulletin 2006-39, *Automated Clearing House Activities* (Sept. 1, 2006), http://www.occ.gov/news-issuances/bulletins/2006/bulletin-2006-39.html.
[11] *Id* (emphasis added).
[12] *Id*.

monitoring to ensure effective compliance with all regulatory bodies.

54.     As a result of the extensive merchant and transaction monitoring that BofA necessarily undertakes as a part of its normal business operations, BofA was and is aware of the Illegal Payday Loan activity it was processing on its customers' deposit accounts.

**E.     Pursuant to NACHA Rules, BofA Monitors Its Accounts For Illegal Activity**

55.     In the ACH Network, RDFIs have specific duties and obligations to combat unlawful transactions.

56.     In particular, the NACHA Rules govern every member of the ACH Network and are structured around the independent obligations of Originating Depository Financial Institutions ("ODFIs") and RDFIs: "The [NACHA] Rules are organized around the types of participants in the ACH Network and acknowledge the major roles played by originating and receiving financial institutions [and] therefore dedicating large sections to each of these roles."[13]

57.     The premise of the NACHA Rules is clear: RDFIs have the ability and duty to detect patterns of unauthorized transactions.

58.     First, the NACHA Rules specifically require all parties involved in the processing of ACH transactions to adhere to all state and federal laws in the United States.   These requirements are meant to keep illicit and unlawful transactions out of the ACH Network.

59.     In addition, the NACHA Rules require participants in the ACH Network to perform risk-based due diligence and monitoring for unlawful transactions and merchants.   The following Policy Statement was adopted by the NACHA Board of Directors on August 22, 2002:

> Fraud and various forms of financial abuse have found their way into every facet of the U.S. payment systems.   The NACHA Board believes that the Automated Clearing House Network must maintain the highest standards of fraud prevention to retain the integrity of the payment mechanism and the trust and confidence of

---

[13] *NACHA Operating Rules & Guidelines* (Corporate ed., 2013), Introduction.

its users. Therefore, the NACHA Board resolves and strongly urges that all participants implement adequate control systems to ***detect and prevent fraud and abusive financial transactions*** (emphasis added).[14]

60.     The NACHA Rules require all RDFIs to conduct a risk assessment of their ACH activities, including, *inter alia*, "1) assessing the nature of risks associated with ACH activity; 2) performing appropriate know-your-customer due diligence; 3) establishing controls for Originators, third-parties, and direct-access to ACH Operator relationships, and 4) having adequate management, information and reporting systems to monitor and mitigate risk."[15]

61.     In a March 14, 2013 operations bulletin, which interpreted the NACHA Rules, NACHA stated that "RDFIs ***that detect a pattern of unauthorized transactions from a single Originator***, or that have customers that experience ***unauthorized debit activity***, can contact the ODFI(s) for additional information and their Regional Payment Association for guidance, and also can use NACHA's National System of Fines to pursue an action against the ODFI(s)."[16]

62.     It is for all these reasons that BofA maintains a sophisticated in-house transaction monitoring operation, utilizing dedicated technology and staffing focused on transaction monitoring to ensure effective compliance with all regulatory bodies.

63.     As a result of the extensive merchant and transactions monitoring that BofA necessarily undertakes pursuant to its obligations in the ACH Network, BofA was aware of the Illegal Payday Loan activity it was processing on its customers' deposit accounts.

**F.     The ACH Network Provided BofA With Sufficient Information To Identify Illegal Payday Lenders and Loans**

64.     First, for every ACH transaction, the Network provided BofA with the

---

[14] *NACHA Operating Rules & Guidelines* (Corporate ed., 2013), NACHA Board of Directors Policy Statements, ORii.

[15] *See Id.* at Ch. 4.

[16] NACHA, ACH Operations Bulletin #2-2013, *High-Risk Originators and Questionable Debit Activity* (Mar. 14, 2013), available at https://www.nacha.org/news/ach-operations-bulletin-2-2013-high-risk-originators-and-questionable-debit-activity

Originator[17] of an ACH entry, the location of the bank account of its customer, and the Receiver.[18]  Each Originator has a unique "Company Identification Number" that alerted BofA when an Illegal Payday Lender was attempting to initiate a credit or debit entry to or from one of its customer's accounts.

65.     Second, the Network provides other "red flags" that alerted BofA to the fact that unlawful activity was occurring.  Chief among these "red flags" are historically excessive "return rates" on ACH credit or debit transactions initiated by the Originator (or third party payment processor),[19] which are coded under categories such as insufficient funds (code R01); authorization revoked by the customer (code R07); payment stopped by the customer (code R08); and/or customer advises debit is not authorized, improper, or ineligible (code R10). Credits or debits initiated by an originator (or third party payment processor) with historically high return rates under these categories alerted or should have alerted BofA to unlawful activity and at the very least, triggered BofA's obligation to request in writing from the ODFI a copy of the Receiver's authorization for each credit and debit entry initiated.

66.     On information and belief, ACH credits and debits originated on behalf of the Illegal Payday Lenders generated return rates far in excess of the average return rate for all electronic payments, which is well under 1%.

67.     Third, NACHA Rules require a debit entry to a consumer account originated based on the authorization that is communicated from the Receiver to the Originator via the

---

[17] An Originator is the entity that agrees to initiate the ACH entries into the payment system.  The Originator is usually a company directing a transfer of funds to or from a consumer's or another organization's account.
[18] A Receiver is the natural person or organization that the Originator is requesting the RDFI debit or credit via the ACH Network.
[19] Return rates are coded under categories such as insufficient funds (code R01), authorization revoked by the customer (code R07), payment stopped by the customer (code R08), and/or customer advises debit is not authorized, improper, or ineligible (code R10).

Internet to be coded as a "WEB" entry on the ACH transaction record.[20]   NACHA Rules prescribe heightened vigilance with respect to WEB transactions.

68.     The Plaintiff and members of the Class's Illegal Payday Loan transactions were all WEB entries on the ACH Network.  This information alerted BofA to the possibility of Illegal Payday Loan transactions executed over the Internet.

69.     Indeed, NACHA has recognized that three unique characteristics of the Internet warranted the development of special operating rules for "WEB" transactions:

    a.    The anonymity of the Internet environment in which parties are not certain with whom they are doing business poses unique opportunities for fraud;

    b.    The Internet as an open network requires special security procedures to be deployed to prevent unauthorized access to Receiver financial information; and

    c.    The sheer speed with which a large number of payments can be transacted over the Internet (volume and velocity).[21]

70.     Fourth, NACHA compiles and maintains a list of banned merchants engaged, or suspected to be engaged, in illegal activities called the Terminated Originator Database ("TOD"). The TOD regularly included Illegal Payday Lenders or third party payment processors operating on their behalf.

71.     Fifth, NACHA compiles and maintains a list of ACH originators and third party processors that meet specific "high risk" criteria called the Originator Watch List ("OWL").  The OWL regularly included Illegal Payday Lenders or third party payment processors operating on their behalf.

72.     In sum, BofA was made aware of Illegal Payday Loans and Illegal Payday Lenders via the information provided to it by NACHA and through other means and had the duty

---

[20] *See, e.g.*, 2013 NACHA Operating Rules Subsection 2.5.17.
[21] 2013 NACHA Operating Guidelines, Ch. 48, Internet Initiated/ Mobile Entries (WEB).

and ability to prevent these illegal loan account debits.

G.   **State and Federal Regulatory Agencies, Public Records, And Media Reports Alerted BofA To The Illegal Payday Lenders Unlawful Activities Across The Country And In The State Of New York**

**New York**

73.   New York has long been at the forefront of protecting its citizens from Illegal Payday Lenders.

74.   As early as 1999, Elizabeth McCaul, then-Acting Superintendent of Banks for The Banking Department of the State of New York (predecessor to the New York Department of Financial Services) issued an "All Institution" industry letter warning banks and other lenders that out-of-state companies may be making Illegal Payday Loans over the Internet, violating New York law.[22]

75.   In June of 2000, Elizabeth McCaul sent yet another industry letter again warning banks and consumers about Illegal Payday Loans.  The letter noted that the Banking Department contacted one company that had been offering payday loans in New York and secured the company's agreement to immediately stop taking applications for payday loans from New York State residents.[23]

76.   In 2004, the New York Attorney General took actions against four different Illegal Payday Lenders that had been making usurious loans to New York residents.  All four Illegal Payday Lenders ultimately agreed or were ordered by the court to stop making usurious payday loans in New York.  The Attorney General commented in his press release that "[p]ayday lending can be the modern equivalent of loan sharking and . . . this office [would] continue to

---

[22] Letter from Elizabeth McCaul, Acting Superintendent of Banks, *Payday Lenders* (June 29, 1999), http://www.dfs.ny.gov/legal/industry_circular/banking/il990629.htm.
[23] Letter from Elizabeth McCaul, Acting Superintendent of Banks, *Payday Loans* (June 30, 2000), http://www.dfs.ny.gov/legal/industry_circular/banking/il000613.htm.

take aggressive action to stop payday lenders from victimizing New York consumers."[24]

77.     In 2009, the New York Attorney General secured a $5.2 million settlement from two out-of-state Illegal Payday Lenders that agreed to provide refunds to the more than 14,000 New York consumers who were victimized as well as additional monies in penalties and costs.

78.     In February of 2013, Governor Cuomo announced that the DFS sent letters to all debt collectors in New York stating that it is illegal to attempt to collect a debt on a payday loan since such loans are illegal in New York.  The letters stated, "[t]his notice is to remind all persons and entities collecting debts in New York that they should not seek to collect on illegal, usurious loans made in New York, including payday loans."  It noted further, "[t]his includes illegal, usurious payday loans made in New York over the Internet and via phone and mail."[25]

79.     In April of 2013, DFS came out in strong opposition to the payday loan industry's aggressive efforts to legalize unsafe payday loans in New York.  In a letter to New York State Assembly Speaker Sheldon Silver, Superintendent Benjamin Lawsky noted that "New York has been a leader in protecting consumers from predatory short-term, high interest payday loans."[26]

80.     In August of 2013, the New York Attorney General filed a lawsuit against three Illegal Payday Lenders and their owners, alleging that they violated usury laws by making loans that carry annual interest rates of between 89% and 335%.  It alleged that the three Illegal Payday Lenders made nearly 18,000 loans to New York borrowers totaling $38 million in

---

[24] Press Release, *Payday Lender to Forgive Loans and Provide Refunds* (Nov. 22, 2004), http://www.ag.ny.gov/press-release/payday-lender-forgive-loans-and-provide-refunds.
[25] Press Release, *Governor Cuomo Announces Department of Financial Services Notifies Debt Collectors Not to Seek Collection on Illegal Payday Loans* (Feb. 22, 2013), https://www.governor.ny.gov/press/02222013cuomo-annc-deptoffinanc-debtcollect-not-seek-collections-illegal-paydayloans
[26] Letter from Benjamin M. Lawsky to the Hon. Sheldon Silver, *Assembly Bill 1113-A (The "short-term financial services loan act")* (Apr. 29, 2013), http://www.dfs.ny.gov/about/press2013/ pr1304291-ltr.pdf.

principal since 2010, on which the borrowers owed more than $185 million in finance charges.[27]

81.     Also in August of 2013, The New York Times reported that "New York is widening its scrutiny [of illegal payday loans] to include the banks that enable the lenders to operate."  The New York Times noted that New York state officials recognized that "the banks . . . are a critical link between consumers and payday lenders [that] allow the lenders to automatically withdraw monthly loan payments from borrowers' checking accounts."  It further noted that "the Manhattan district attorney's office [was also] investigating the banks for permitting illicit withdrawals from customer accounts."[28]

**Federal Actions**

82.     Currently, at least six federal agencies, including the U.S. Department of Justice ("DOJ"), the Consumer Protection Financial Bureau ("CFPB"), and the Federal Trade Commission ("FTC"), are coordinating an extensive investigation regarding the online payday lending industry.

83.     To date, the Department of Justice has issued civil subpoenas to more than fifty financial companies, including banks and payment processors that connect borrowers with online lenders.[29]  Michael Bresnick, a former federal prosecutor who heads the Financial Fraud Enforcement Task Force,[30] discussed the DOJ's subpoenas and stated that the banks that hold accounts for Illegal Payday Lenders are ignoring red flags and "aren't always blind to the

---

[27] Chris Cumning, *New York AG Sues Online Payday Lenders* (American Banker, Aug. 12, 2013), http://www.americanbanker.com/issues/178_155/new-york-ag-sues-online-payday-lenders-1061279-1.html.
[28] Jessica Silver-Greenberg & Ben Protess, *New York Tells Online Lenders to Abide by State's Interest Rate Cap* (New York Times, Aug. 5, 2013), http://dealbook.nytimes.com/2013/08/05/online-lenders-told-to-abide-by-interest-rate-cap-in-new-york/.
[29] Daniel Wagner, *Six Federal Agencies are Investigating Online Payday Lenders* (Cntr. For Public Integrity, Aug. 8, 2013), http://www.publicintegrity.org/2013/08/08/13145/six-federal-agencies-are-investigating-online-payday-lenders.
[30] The task force is led by the DOJ "and includes more than two dozen federal and state regulators and law enforcement entities." *Id.*

fraud."[31]

84.     Also in 2013, it was announced that the FDIC had audited banks with relationships to Illegal Payday Lenders and told banks working with these lenders that these lenders posed a "'reputational risk that could harm the banks' safety and soundness."[32]

85.     The focus of these federal efforts is "whether banks have enabled online lenders to withdraw money illegally from borrowers' checking accounts in a bid to boost their own take from payment-processing fees and customer refund requests."[33]

86.     As a result of federal and state pressure, as well as private civil litigation instituted in federal courts, banks have begun terminating their relationships with Illegal Payday Lenders.  In a telling email from an unnamed bank to an Illegal Payday Lender, the bank wrote, "[B]ased on your performance, there's no way we shouldn't be a credit provider. . . . Our only issue is, and it has always been, the space in which you operate. It is the scrutiny that you, and now that we, are under."[34]

**H.     Bank of America Has Significant Financial Interests In Making Sure That The Payday Lending Industry Is Successful And Profitable**

87.     BofA's decision not to protect its customers and aid and abet Illegal Payday Lenders' collection of Illegal Payday Loans is attributable in large part to its significant financial interest in Illegal Payday Lenders. Quite simply, when Illegal Payday Lenders collect their illegal debts, BofA profits as well.

88.     Access to credit is the life-blood of any lending business, especially Illegal

---

[31] *Id.*

[32] Carter Dougherty, *U.S. regulators Squeeze Banks to Cut Ties to Some Online Lenders* (Bloomberg, Aug. 9, 2013), http://www.bloomberg.com/news/2013-08-08/u-s-regulators-squeeze-online-lenders-via-bank-transfer-system.html.

[33] Danielle A. Douglas, *Banks to Payday Lenders: Quit the Business or We'll Close Your Account* (Washington Post, Apr. 11, 2014), http://www.washingtonpost.com/business/economy/banks-to-payday-lenders-quit-the-business-or-well-close-your-account/2014/04/11/afd34976-c0c6-11e3-bcec-b71ee10e9bc3_story.html.

[34] *Id.*

Payday Lenders.  Illegal Payday Lenders do not have a bank charter and their business model is based on high levels of loss and high customer acquisition costs, requiring access to significant lines of credit. Major banks, especially BofA, provide these lines of credit to Illegal Payday Lenders, and in so doing, profit from billions of dollars in interest revenue from their loans to Illegal Payday Lenders.

89.     Specifically, according to a 2013 report entitled *Connecting the Dots: How Wall Street Brings Fringe Lending to Main Street*, BofA has extended more than $663 million in credit to Illegal Payday Lenders second only to Wells Fargo Bank.[35]

90.     Indeed, BofA has been heavily invested in Illegal Payday Lenders from the outset. A report from the non-profit organizations National People's Action and Public Accountability Initiative, credited BofA with "fueling the growth of the [payday lending] industry" when it "provided critical early financing to the [industry's] largest payday lender."[36]

91.     The importance of these lines of credit for Illegal Payday Lenders cannot be understated. For instance, payday lenders have made the following statements on the essential nature of these lines of credit:

a.      "We depend on loans and cash management services from banks to operate our business. If banks decide to stop making loans or providing cash management services to us, it could have a material adverse effect on our business, results of operations and financial condition."

b.      "Potential disruptions in the credit markets may negatively impact the availability and cost of short[-]term borrowing under our senior secured credit facility, which could adversely affect our results of operations."

---

[35] Adam Rust, *Connecting the Dots: How Wall Street Brings Fringe Lending to Main Street* (Reinvestment Partners 2013), available at
http://www.reinvestmentpartners.org/sites/reinvestmentpartners.org/files/Payday_Finance_RP_Final_0.pdf.
[36] Kevin Connor & Matthew Skomarovsky, *The Predators' Creditors: How the Biggest Banks are Bankrolling the Payday Loan Industry* (Nat'l People's Action, Sept. 2010), available at http://public-accountability.org/wp-content/uploads/2011/09/payday-final-091410.pdf

    c.    "Inability to access the credit markets on acceptable terms, if at all, would have a materially adverse effect on the Company."

    d.    "We require continued access to capital. A significant reduction in cash flows from operations or the availability of credit could materially and adversely affect our ability to achieve our planned growth and operating results. We currently have a credit agreement with a syndicate of banks."

    e.    "A substantial portion of our liquidity needs may be funded from borrowings under our credit facility . . . Certain banks have notified us and other companies in the cash advance and check-cashing industries that they will no longer maintain bank accounts for these companies due to reputational risks and increased compliance costs of servicing money services businesses and other cash intensive industries. If one of our larger depository banks requests that we close our bank accounts or puts other restrictions on how we use their services, we could face higher costs of managing our cash and limitations on our ability to maintain or expand our business."

    f.    "The Company generates cash from income from continuing operations. The cash is primarily used to fund finance receivables growth. To the extent finance receivables growth exceeds income from continuing operations, generally the Company increases its borrowings under its revolving credit facilities to provide the cash necessary to fund operations. On a long-term basis, the Company expects its principal sources of liquidity to consist of income from continuing operations and borrowings under revolving credit facilities and/or fixed interest term loans. Any adverse changes in the Company's ability to borrow under revolving credit facilities or fixed interest term loans, or any increase in the cost of such borrowings, would likely have a negative impact on the Company's ability to finance receivables growth which would adversely affect the Company's growth and business strategies."[37]

92.    In addition to the hundreds of millions of dollars in credit BofA supplied to Illegal Payday Lenders, individuals with BofA relationships sit on the boards of directors of at least three of the nation's largest payday lenders.[38]

93.    After this report was published, BofA announced that it would stop funding

---

[37] *Id.*
[38] *Id.*

Illegal Payday Lenders.[39]   However, BofA's long-term financing of Illegal Payday Lenders has allowed it to reap hundreds of millions, if not billions, of dollars in interest income at the expense of their own customers such as the Plaintiff and the members of the Class.

I.      **Plaintiff Jeanette Costoso's Internet Payday Loans**

**Illegal Payday Loan #1**

94.     On or about May 14, 2013, Plaintiff Costoso applied for and received a payday loan in the amount of $500.00 from Mambo Cash by completing an application over the Internet.

95.     The entirety of the interest plus principal, which equaled $625.00, was due 11 days from the date of the loan. Thus, the nominal annual interest on the loan was at least 1,277.5%.

96.     On or about June 21, 2013, Mambo Cash initiated a debit transaction of $175.75 from Plaintiff Costoso's BofA checking account in New York through the ACH Network. The payment was processed as a debit by BofA resulting in BofA taking this amount from Plaintiff Costoso's account. The payment applied solely to interest and did not reduce the amount of Plaintiff Costoso's $500.00 debt.

97.     Mambo Cash's frequent debits of Plaintiff Costoso's checking account with BofA caused Plaintiff Costoso's account to enter into a negative balance. Consequently, BofA charged Plaintiff Costoso overdraft fees at the time of or shortly after processing Mambo Cash's debits.

98.     For example, on July 5, 2013, Mambo Cash initiated a debit transaction of $148.75 from Plaintiff Costoso's BofA checking account in New York. The payment was processed as a debit by BofA resulting in BofA taking this amount from Plaintiff Costoso's account. As a result, Plaintiff Costoso was charged by and paid to BofA an NSF returned item

---

[39] David Dayen, *Payday Lending: The Loans with 350% Interest and a Grip on America* (The Guardian, Mar. 23, 2014), http://www.theguardian.com/money/2014/mar/23/payday-lending-interest-banks-advantage-congress

fee of $35.00 on July 8, 2013.

**Illegal Payday Loan #2**

99.    On or about May 17, 2013, Plaintiff Costoso applied for and received a payday loan in the amount of $400.00 from North Cash by completing an application on the internet.

100.    The entirety of the interest plus principal, which equaled $3,220.00, was scheduled to be paid over the course of 35 bi-weekly payments. Thus, the nominal annual percentage rate on the loan was at least 803.6%.

101.    On or about May 29, 2013, North Cash initiated a debit transaction of $178.34 from Plaintiff Costoso's BofA checking account in New York through the ACH Network. The payment was processed as a debit by BofA resulting in BofA taking this amount from Plaintiff Costoso's account. The payment was applied solely to interest and did not reduce the amount of the Plaintiff's $400.00 debt.

102.    North Cash's frequent debits of Plaintiff Costoso's checking account with BofA caused Plaintiff's account to enter into a negative balance. Consequently, BofA charged Plaintiff Costoso overdraft fees at the time of or shortly after processing North Cash's debits.

103.    For example, on July 12, 2013, North Cash initiated a debit transaction of $178.34 from Plaintiff Costoso's BofA checking account in New York. The payment was processed as a debit by BofA resulting in BofA taking this amount from the Plaintiff Costoso's account. As a result, Plaintiff Costoso was charged by and paid to BofA an NSF returned item fee of $35.00 on July 15, 2013.

**Illegal Payday Loan #3**

104.    On or about May 22, 2013, Plaintiff Costoso applied for and received a payday loan in the amount of $250.00 from GTI Holdings by completing an application over the Internet.

23

105.    The entirety of the interest plus principal, which equaled $325.00, was due 20 days from the date of the loan. Thus, the nominal annual interest on the loan was at least 547.5%.

106.    On or about June 14, 2013, GTI Holdings initiated a debit transaction of $75.00 from Plaintiff Costoso's BofA checking account in New York through the ACH Network. The payment was processed as a debit by BofA resulting in BofA taking this amount from Plaintiff Costoso's account. The payment applied solely to interest and did not reduce the amount of Plaintiff Costoso's $250.00 debt.

107.    GTI Holdings' frequent debits of Plaintiff Costoso's checking account with BofA caused Plaintiff Costoso's account to enter into a negative balance. Consequently, BofA charged Plaintiff Costoso overdraft fees at the time of or shortly after processing GTI Holdings' debits.

108.    For example, on June 28, 2013, GTI Holdings initiated a debit transaction of $75.00 from Plaintiff Costoso's BofA checking account in New York. The payment was processed as a debit by BofA resulting in BofA taking this amount from the Plaintiff Costoso's account. As a result, Plaintiff Costoso was charged by and paid to BofA an overdraft item fee of $35.00 on July 1, 2013.

**Illegal Payday Loan #4**

109.    On or about June 10, 2013, Plaintiff Costoso applied for and received a payday loan in the amount of $300.00 from United Holdings by completing an application over the Internet.

110.    The entirety of the interest plus principal, which equaled $390.00, was due 21 days from the date of the loan. Thus, the nominal annual interest on the loan was at least 730%.

111.    On or about June 28, 2013, United Holdings initiated a debit transaction of $90.00 from Plaintiff Costoso's BofA checking account in New York through the ACH Network. The

payment was processed as a debit by BofA resulting in BofA taking this amount from Plaintiff Costoso's account. The payment applied solely to interest and did not reduce the amount of Plaintiff Costoso's $300.00 debt.

112.    United Holdings' frequent debits of Plaintiff Costoso's checking account with BofA caused Plaintiff Costoso's account to enter into a negative balance. Consequently, BofA charged Plaintiff Costoso overdraft fees at the time of or shortly after processing United Holdings' debits.

113.    For example, on July 15, 2013, United Holdings initiated a debit transaction of $90.00 from Plaintiff Costoso's BofA checking account in New York. The payment was processed as a debit by BofA resulting in BofA taking this amount from the Plaintiff Costoso's account. As a result, Plaintiff Costoso was charged by and paid to BofA an NSF returned item fee of $35.00 on July 16, 2013.

**Illegal Payday Loan #5**

114.    On or about June 6, 2013, Plaintiff Costoso applied for and received a payday loan in the amount of $400.00 from Hydra Fund by completing an application over the Internet.

115.    The entirety of the interest plus principal, which equaled $520.00, was due about 23 days from the date of the loan. Thus, the nominal annual interest on the loan was at least 497.73%.

116.    On or about June 28, 2013, Hydra Fund initiated a debit transaction of $120.00 from Plaintiff Costoso's BofA checking account in New York through the ACH Network. The payment was processed as a debit by BofA resulting in BofA taking this amount from Plaintiff Costoso's account. The payment applied solely to interest and did not reduce the amount of Plaintiff Costoso's $400.00 debt.

117.    Hydra Fund's frequent debits of Plaintiff Costoso's checking account with BofA caused Plaintiff Costoso's account to enter into a negative balance. Consequently, BofA charged Plaintiff Costoso overdraft fees at the time of or shortly after processing Hydra Fund's debits.

118.    For example, on July 12, 2013, Hydra Fund initiated a debit transaction of $120.00 from Plaintiff Costoso's BofA checking account in New York. The payment was processed as a debit by BofA resulting in BofA taking this amount from the Plaintiff Costoso's account. As a result, Plaintiff Costoso was charged by and paid to BofA an NSF returned item fee of $35.00 on July 15, 2013.

**Illegal Payday Loan #6**

119.    On or about June 6, 2013, Plaintiff Costoso applied for and received a payday loan in the amount of $300.00 from Mass Street by completing an application over the Internet.

120.    The entirety of the interest plus principal, which equaled $390.00 was due 23 days from the date of the loan. Thus, the nominal annual interest on the loan was at least 782.14%.

121.    On or about June 28, 2013, Mass Street initiated a debit transaction of $90.00 from Plaintiff Costoso's BofA checking account in New York through the ACH Network. The payment was processed as a debit by BofA resulting in BofA taking this amount from Plaintiff Costoso's account. The payment applied solely to interest and did not reduce the amount of Plaintiff Costoso's $300.00 debt.

122.    Mass Street Group's frequent debits of Plaintiff Costoso's checking account with BofA caused Plaintiff Costoso's account to enter into a negative balance. Consequently, BofA charged Plaintiff Costoso overdraft fees at the time of or shortly after processing Mass Street Group's debits.

123.    For example, on July 26, 2013, Mass Street initiated a debit transaction of $90.00

from Plaintiff Costoso's BofA checking account in New York.  The payment was processed as a debit by BofA resulting in BofA taking this amount from the Plaintiff Costoso's account. As a result, Plaintiff Costoso was charged by and paid to BofA an NSF returned item fee of $35.00 on July 29, 2013.

## CLASS ACTION ALLEGATIONS

124.    Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

125.    The Class is defined as:

> All BofA account holders in New York whose accounts, within the last six (6) years preceding the filing of this action to the date of class certification, were debited for Illegal Payday Loans.

126.    Excluded from the Class is Defendant; its parents, subsidiaries, affiliates, officers and directors; any entity in which Defendant has a controlling interest; governmental entities; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

127.    Numerosity.  The members of the Class are so numerous that joinder is impractical.  The Class consists of thousands of members, whose identity is within the knowledge of and can be ascertained only by resort to Defendant's records.

128.    Typicality.  The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all members of the Class, has been damaged by Defendant's misconduct in that she has had her account depleted by Illegal Payday Loan payments and has been assessed unlawful and deceptive bank fees.  Furthermore, the factual basis of Defendant's misconduct is common to all Class members and represents a common

thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

129.    Commonality/Predominance.    There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

130.    Among the questions of law and fact common to the Class:

a.      Whether BofA violated New York's state consumer protection statutes by participating in a scheme to flout state laws banning payday loans;

b.      Whether BofA breached the contract it has with members of the Class;

c.      Whether BofA was unjustly enriched as a result of overdraft and returned item fees it assessed on accounts as a result of debits made on behalf of Illegal Payday Lenders;

d.      Whether BofA maintained unconscionable policies and procedures; and

e.      Whether BofA violated the NACHA Rules.

131.    Other questions of law and fact common to the Class include:

a.      The proper method or methods by which to measure damages; and

b.      The injunctive and declaratory relief to which the Class is entitled.

132.    Adequacy.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

133.    Superiority.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendant, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses

and Defendant's misconduct will proceed without remedy.

134.    Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## FIRST CLAIM FOR RELIEF
## BREACH OF CONTRACT
### (on Behalf of the Class)

135.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and to the extent necessary, pleads this cause of action in the alternative.

136.    Plaintiff and BofA have contracted for bank account deposit, ATM, and debit card services, as embodied in BofA's Account Agreement and related documentation.

137.    The Account Agreement incorporated NACHA Rules, promising accountholders that all ACH transactions would be processed strictly in accordance with the ACH Network's rules and procedures.

138.    Those NACHA Rules, in turn, require BofA to block transactions it knows to be unlawful or unauthorized under NACHA Rules.

139.    The Account Agreement separately provided BofA with the contractual obligation to block transactions it knew or believed to be unlawful.

140.    BofA breached its contractual promise to process all ACH transactions in

accordance with the NACHA Rules when it processed Illegal Payday Loan transactions it knew to be unlawful.

141.    The Illegal Payday Loan debits also caused the Plaintiff and the Class deposit accounts to incur overdraft and/or returned item fees that would not have been assessed without BofA's improper debits for Illegal Payday Loan payments.

142.    These fees were in violation of the Account Agreement, which did not allow BofA to assess fees on transactions that were unlawful or unauthorized under NACHA Rules.

143.    The Plaintiff and the Class members have sustained damages as a result of BofA's breach of contract.

**SECOND CLAIM FOR RELIEF**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(On Behalf of the Class)**

144.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and to the extent necessary, pleads this cause of action in the alternative.

145.    BofA violated the covenant of good faith and fair dealing when it used its discretion to process or refuse to process debits to repeatedly and in bad faith process transactions it knew were unlawful and/or in violation of NACHA Rules.

146.    Under the laws of New York good faith is an element of every contract pertaining to the assessment of overdraft and returned item fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit not merely the letter of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to

30

specify terms constitute examples of bad faith in the performance of contracts.

147.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

148.     BofA has breached the covenant of good faith and fair dealing in the Account Agreement through a) its processing of transactions it knew or should have known to be initiated by Illegal Payday Lenders;  and b) its imposition of overdraft and/or returned item fees generated as a result of its honoring illegal and unenforceable transactions on Illegal Payday Loans.

149.     Plaintiff and Class members have sustained damages as a result of BofA's breach of the covenant of good faith and fair dealing.

### THIRD CLAIM FOR RELIEF
### UNCONSCIONABILITY
**(On Behalf of the Class)**

150.     Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and to the extent necessary, pleads this cause of action in the alternative.

151.     BofA's Bank's policies and practices are or were substantively and procedurally unconscionable in the following respects, among others:

> a.     BofA did not disclose or reasonably disclose to customers that it would charge overdraft and returned item fees generated solely as a result of its honoring of illegal and unenforceable transactions on Illegal Payday Loans;
>
> b.     BofA did not obtain affirmative consent from the Plaintiff and the members of the Class prior to processing an illegal and unenforceable transaction on Illegal Payday Loans that would overdraw the account and result in the imposition of an overdraft or returned item fee;

31

c.   BofA did not alert the Plaintiff and the members of the Class that an illegal and unenforceable transaction on Illegal Payday Loans would overdraw the account and result in the imposition of an overdraft and/or returned item fee;

d.   The Account Agreement and related documents, are contracts of adhesion in that they are standardized forms, imposed and drafted by BofA, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement it its entirety;

e.   The Account Agreement provided to customers is ineffective, ambiguous, deceptive, unfair and misleading in that it does not unambiguously state that BofA always charges overdraft and returned item fees generated as a result of BofA's honoring illegal and unenforceable transactions on Illegal Payday Loans.

152.   Considering the great business acumen and experience of BofA in relation to the Plaintiff and the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

153.   The imposition of overdraft and/or returned item fees generated solely as a result of BofA's honoring illegal and unenforceable transactions on Illegal Payday Loans is itself unconscionable.

154.   The Plaintiff and Class members have sustained damages as a result of BofA's unconscionable policies and practices as alleged herein.

### FOURTH CLAIM FOR RELIEF
### CONVERSION
**(On Behalf of the Class)**

155.   Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

156.     BofA had and continues to have a duty to maintain and preserve its customers'
deposit accounts and to prevent their diminishment through its own wrongful acts or wrongful
acts of others.

157.     BofA has wrongfully collected overdraft and/or returned item fees from the
Plaintiff and Class members, and has taken specific and readily identifiable funds from their
accounts in payment of these fees in order to satisfy them.

158.     BofA has, without proper authorization, assumed and exercised the right of
ownership over these funds, in hostility to the rights of the Plaintiff and Class members, without
legal justification.

159.     BofA continues to retain these funds unlawfully without the consent of the
Plaintiff or Class members.

160.     BofA intends to permanently deprive the Plaintiff and Class members of these
funds.

161.     These funds are properly owned by the Plaintiff and Class members, not BofA,
which now claims that it is entitled to their ownership, contrary to the rights of the Plaintiff and
the Class members.

162.     The Plaintiff and Class members are entitled to the immediate possession of these
funds.

163.     BofA has wrongfully converted these specific and readily identifiable funds.

164.     BofA's wrongful conduct is continuing.

165.     As a direct and proximate result of this wrongful conversion, the Plaintiff and
Class members have suffered and continue to suffer damages.

166.     By reason of the foregoing, the Plaintiff and Class members are entitled to recover

from BofA all damages and costs permitted by law, including all amounts that BofA has wrongfully converted.

**FIFTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT (IN THE ALTERNATIVE)**
**(On Behalf of the Class)**

167.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

168.    Plaintiff, on behalf of herself and the Class members, assert a common law claim for unjust enrichment.

169.    By means of BofA's wrongful conduct alleged herein, BofA knowingly provides banking services to the Plaintiff and Class members that are unfair, unconscionable, and oppressive.

170.    BofA knowingly received and retained wrongful benefits and funds from the Plaintiff and Class members. In so doing, BofA acted with conscious disregard for the rights of the Plaintiff and Class members.

171.    As a result of BofA's wrongful conduct as alleged herein, BofA has been unjustly enriched at the expense of, and to the detriment of, the Plaintiff and Class members.

172.    BofA's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

173.    Under the common law doctrine of unjust enrichment, it is inequitable for BofA to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft and returned item fees on the Plaintiff and Class members in an unfair, unconscionable, and oppressive manner.  BofA's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

174.    The financial benefits derived by BofA rightfully belong to the Plaintiff and Class members.  BofA should be compelled to disgorge in a common fund for the benefit of the Plaintiff and Class members all wrongful or inequitable proceeds received by them. A constructive trust should be imposed upon all wrongful or inequitable sums received by BofA traceable to the Plaintiff and Class members.

175.    The Plaintiff and Class members have no adequate remedy at law.

### SIXTH CLAIM FOR RELIEF
### VIOLATION OF NEW YORK GBL §§ 349 *et seq.*
### (On Behalf of the Class)

176.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

177.    Pursuant to GBL §§ 349 *et seq*. it is unlawful to engage in any deceptive acts or practices in the conduct of any business, trade, or commerce in this State.

178.    BofA has engaged and continues to engage in deceptive business practices in violation of GBL § 349, including, *inter alia*:

    a.    Violating the public policy of the State of New York by processing debits on Illegal Payday Loans.

    b.    Representing that it would act in accordance with NACHA Rules and not process illegal transactions, when in fact it did not.

    c.    Repeatedly processing illegal transactions despite rules and laws requiring the bank to monitor and reject such transactions.

    d.    Repeatedly charging overdraft or returned item fees as a result of illegal transactions, despite a contract that does not expressly or impliedly allow for such fees.

179.    Pursuant to GBL §§ 349 and 350-d, the Plaintiff and Class members seek injunctive relief, restitution, damages, and penalties.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff and Class members demand judgment as follows:

1.      Declaring BofA's ACH policies and practices to be wrongful, unfair and unconscionable and providing appropriate injunctive relief;

2.      Actual damages in an amount according to proof;

3.      Restitution of all bank fees paid to BofA by the Plaintiff and Class members, as a result of the wrongs alleged herein in an amount to be determined at trial;

4.      Disgorgement of the ill-gotten gains derived by BofA from its misconduct;

5.      Punitive damages and exemplary;

6.      Pre-judgment interest at the maximum rate permitted by applicable law;

7.      Costs and disbursements assessed by the Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.      Such other relief as this Court deems just and proper.

Dated: July 2, 2014                    Respectfully submitted,


                                       /s/ *Daniel L. Berger*
                                       **GRANT & EISENHOFER  P.A.**
                                       Daniel L. Berger
                                       485 Lexington Avenue
                                       New York, NY 10017
                                       Tel:    (646) 722-8522
                                       Fax:    (646) 722-8501
                                       dberger@gelaw.com

                                       Adam J. Levitt
                                       30 North LaSalle Street, Suite 1200
                                       Chicago, IL 60602
                                       Tel:    (312) 214-0000
                                       Fax:    (312) 214-0001
                                       alevitt@gelaw.com

Raymond F. Schuenemann III
123 Justison Street
Wilmington, DE 19801
Tel:    (302) 622-7000
Fax:    (302) 622-7100
rschuenemann@gelaw.com

**HAUSFELD LLP**
James J. Pizzirusso
Nathaniel C. Giddings
1700 K Street NW
Suite 650
Washington, D.C. 20006
Tel:    (202) 540-7200
Fax:    (202) 540-7201
jpizzirusso@hausfeldllp.com
ngiddings@hausfeldllp.com

**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei
Jeffrey D. Kaliel
Anna C. Haac
2000 L Street, N.W.
Suite 808
Washington, D.C. 20036
Tel:    (202) 973-0900
Fax:    (202) 973-0950
hzavareei@tzlegal.com
jkaliel@tzlegal.com
ahaac@tzlegal.com

**STUEVE SIEGEL HANSON LLP**
Norman E. Siegel
Steve Six
J. Austin Moore
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel:    (816) 714-7100
Fax:    (816) 714-7101
siegel@stuevesiegel.com
six@stuevesiegel.com
moore@stuevesiegel.com

**CHITWOOD HARLEY HARNES LLP**
Darren T. Kaplan
1350 Broadway, Suite 908
New York, NY 10018
Tel: (917) 595-3600
Fax: (404) 876-4476
dkaplan@chitwoodlaw.com

**KOPELOWITZ OSTROW P.A.**
Jeffrey M. Ostrow
Jason H. Alperstein
200 S.W. 1st Avenue, 12th Floor
Fort Lauderdale, Florida 33301
Tel:     (954) 525-4100
Fax:     (954) 525-4300
ostrow@KOlawyers.com
alperstein@KOlawyers.com

*Counsel for Plaintiff and the Class*