**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
JEANETTE COSTOSO, individually and on
behalf of all others similarly situated,

              Plaintiff,                      **MEMORANDUM OF**
                                            **DECISION AND ORDER**

      -against-                         14-cv-4100 (ADS)(ARL)

BANK OF AMERICA, N.A.,

              Defendant.
--------------------------------------------------------X


**<u>APPEARANCES:</u>**

**Darren Kaplan Law Firm, P.C.**
*Attorneys for the Plaintiff*
1359 Broadway
Suite 2001
New York, NY 10018
     By: Darren T. Kaplan, Esq., Of Counsel

**Tycko & Zavareei LLP**
*Attorneys for the Plaintiff*
2000 L Street Nw Suite 808
Washington, DC 20036
     By: Hassan Zavareei, Esq.
        Jeffrey D. Kaliel, Esq., Of Counsel

**Kopelowitz Ostrow P.A.**
*Attorneys for the Plaintiff*
200 SW 1st Avenue
Suite 1200
Fort Lauderdale, FL 33301
     By: Jason H. Alperstein, Esq., Of Counsel

**Hausfeld LLP**
*Attorneys for the Plaintiff*
1700 K Street, Nw
Suite 650
Washington, DC 20006
     By:  Gosselin Sathya, Esq., Of Counsel

**Stueve Siegel Hanson LLP**
*Attorneys for the Plaintiff*
460 Nichols Road
Ste 200
Kansas City, MO 64112
    By: Stephen N. Six, Esq., Of Counsel

**Sidley Austin LLP**
*Attorneys for the Defendant*
1501 K Street Nw
Washington, DC 20005
    By: Maria B. Earley, Esq.
        Benjamin R. Nagin, Esq., Of Counsel

**SPATT, District Judge**.

This action arises from the Defendant Bank of America, N.A. (the "BOFA" or "Defendant") processing debits on its customers' bank accounts from Payday Lenders it allegedly knew were making unlawful online payday loans in New York. According to the complaint, "[p]ayday loans are short term high interest loans for small amounts of money that typically come due in a matter of days or weeks and require the borrower to provide the payday lender with access to their deposit account for repayment." (Compl., at ¶ 2.)

The Plaintiff Jeanette Costoso (the "Plaintiff"), individually and on behalf of all others similarly situated, alleges that the Payday Loans issued to her violated the provisions of New York Banking Law § 14-a, subdivision 2 and New York Penal Law § 190.40. (Id. at ¶¶ 23, 24, 94-123.)

On July 2, 2014, the Plaintiff commenced this action seeking monetary damages, restitution, and declaratory and injunctive relief.

On September 15, 2014, the Defendant moved pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief can be granted.

For the reasons set forth, the motion to dismiss the complaint is granted.

## I. BACKGROUND

Unless stated otherwise, the following factual allegations are drawn from the complaint and construed in a light most favorable to the non-moving party, the Plaintiff.

A.  The Parties

The Plaintiff, an individual, is a resident of the Incorporated Village of Rockville Centre, Town of Hempstead in Nassau County, New York.

The Defendant is a federally-chartered national banking association headquartered in Charlotte, North Caroline.  The Defendant is engaged in the businesses of, among other things, providing retail banking services to consumers, including in New York.

B.  The Defendant's Standard Account Agreement

The Plaintiff has deposit accounts with the Defendant, the terms of which are contained in a standardized agreement (the "Account Agreement"), annexed as Exhibit A to the complaint.

Of relevance here, the Account Agreement provides: "From time to time, originators that you authorize may send automated clearing house (ACH) credits or debits for your account.  For each ACH transaction, you agree that the transaction is subject to the National Automated Clearing House Association (NACHA) Operating Rules and any local ACH operating rules then in effect" (the Account Agreement, at 45, "NACHA Clause").

NACHA Rule 3.1-3.1.1 provides that Receiving Depository Financial Institutions ("RDFIs") such as the Defendant "must accept Entries that comply with these Rules and are received with respect to an account maintained with that RDFI, subject to its right to return Entries under these Rules."  NACHA Rule 3.11 provides that ""[a]n RDFI must recredit the accountholder for a debit Entry that was, in whole or in part, not properly authorized under these

Rules, as required by these Rules, applicable Legal Requirements, or agreement between the RDFI and the accountholder." NACHA Rule 8.49 defines "Legal Requirements" as "any law, statute, rule or regulation, or any binding published interpretation of any of the foregoing, issued by any government authority (including courts), and any judicial, governmental, or administrative order, judgment, decree or ruling . . ."

With regard to debit entries from consumer accounts, the NACHA 2013 Operating Rules Section 2.3, Subsection 2.3.2.3(b) provides that an authorization that is "otherwise invalid under applicable Legal Requirements[] does not satisfy the requirements" of an "authorization" under the rules.

The Account Agreement also provides as follows: "If at any time we believe that your account may be subject to irregular, unauthorized, fraudulent, or illegal activity, we may, in our discretion freeze the funds in the account and in other accounts you maintain with us, without any liability to you, until such time as we are able to complete our investigation of the account and transactions." (Account Agreement, at 20.)

C. New York State Department of Financial Services ("DFS") Investigation

On August 5, 2013, DFS, which supervises banking and financial institutions in New York, sent letters to 117 banks, including the Defendant, urging these banks to block online lenders from debiting their customers' deposit accounts. (Compl., at ¶ 41.) DFS informed NACHA and these banks of the identities of 35 such Payday Lenders that may attempt to use banks as conduits for illegal conduct. The letter stated that "[t]he Department has uncovered dozens of out-of-state lenders that have used the Internet to solicit and provide illegal payday loans to consumers in New York"; that "Banks have proven to be . . . an essential cog in the vicious machinery that these purveyors of predatory loans use to do an end-run around [the]

law"; and that "[t]o address this unlawful activity, DFS [ ] sent letters to 35 payday lenders directing them to cease and desist offering to lend and lending monies at usurious rates in New York." (Id. at ¶¶ 42-44.)

D.  The Defendant's Monitoring Obligations and Practices

The mainstream electronic payments system, which provides individuals and businesses, including Payday Lenders, access to electronic debits and deposits to consumer deposit accounts, is called the "Automated Clearing House" or "ACH Network." (Id. at ¶ 6.)

On September 1, 2006, the Office of the Comptroller of the Currency ("OCC") provided guidance for all national banks and examiners on managing the risks of ACH activity, explaining that "[n]ational banks may be exposed to a variety of risks when originating, receiving, or processing ACH transactions, or outsourcing these activities to a third party." (Id. at ¶50.)

The OCC guidance advised:

High-Risk Activities

Banks that engage in ACH transactions with high-risk originators or that involve third-party senders face increased reputation, credit, transaction, and compliance risks.  High-risk originators include companies engaged in potentially illegal activities or that have an unusually high volume of unauthorized returns.

Before a bank engages in high-risk ACH activities, the board of directors should consider carefully the risks associated with these activities, particularly the increased reputation, compliance, transaction, and credit risks.  The board should provide clear direction to management on whether, or to what extent, the bank may engage in such ACH activities. Some banks have established policies prohibiting transactions with certain high-risk originators and third-party senders.

(Id.)  In a footnote, the OCC explained the risk to certain banks: "Risks may include the risk of legal liability or damage to an institution's reputation when originators or third-party senders facilitate or engage in activities that violate criminal laws." (Id. at ¶ 51.)

5

Further, the ACH Network, of which the Defendant is a member, has had, at all relevant times, its own requirements for risk-based transaction monitoring and due diligence. The NACHA Rules govern each member of the ACH Network.

On August 22, 2012, the NACHA Board of Directors adopted the following Policy Statement:

> Fraud and various forms of financial abuse have found their way into every facet of the U.S. payment systems. The NACHA Board believes that the Automated Clearing House Network must maintain the highest standards of fraud prevention to retain the integrity of the payment mechanism and the trust and confidence of its users. Therefore, the NACHA Board resolves and strongly urges that all participants implement adequate control systems to detect and prevent fraud and abusive financial transactions.

(Id. at ¶ 59.)

As a result of these risks, the Plaintiff alleges that the Defendant "maintains a sophisticated in-house transaction monitoring operation, utilizing dedicated technology and staffing focused on transaction monitoring to ensure effective compliance with all regulatory bodies" and "was and is aware of the Illegal Payday Loan activity it was processing on its customers' deposit accounts." (Id. at ¶ 53-54.)

E.  The Tools Provided By the ACH Network to Identify Illegal Payday Lenders and Loans

For every ACH transaction, the ACH Network provided the Defendant with the Originator of an ACH entry, the location of the bank account, its customer, and the Receiver.

An Originator is the entity that agrees to initiate ACH entries into the payment system. The Originator is usually a company directing a transfer of funds to or from a consumer's account or another organization's account. Each Originator has a unique "Company Identification Number" that the Plaintiff alleges alerted, or should have alerted, the Defendant

when an Payday Lender was attempting to initiate a credit or debit entry to or from one of its customer's accounts.

A Receiver is the natural person or organization that the Originator is requesting the RDFI debit or credit via the ACH Network.

Further, the ACH Network alerted the Defendant to historically high "return rates" on ACH credit or debit transactions initiated by the Originator (or third party payment processor). According to the Plaintiff, such historically high "return rates" "alerted or should have alerted [the Defendant] to unlawful activity and at the very least, triggered [the Defendant]'s obligation to request in writing from the [Original Depository Financial Institutions] a copy of the Receiver's authorization for each credit and debit entry initiated." (<u>Id.</u> at ¶ 65.)

In addition, 2013 NACHA Operating Rules Subsection 2.5.17 require a debit entry to a consumer account Originator based on the authorization that is communicated from the Receiver to the Originator via the Internet to be coded as a "WEB" entry on the ACH transaction record. The Plaintiff's Payday Loan transactions were all WEB entries on the ACH Network.

Through Chapter 48 of the 2013 NACHA Operating Guidelines, the NACHA has recognized that certain characteristics of the Internet warranted the development of special operating rules for "WEB" transactions. These characteristics include the anonymity of the Internet environment in which parties are not certain with whom they are doing business poses unique opportunities for fraud; the Internet as an open network requires special security procedures to be deployed to prevent unauthorized access to Receiver financial information; and the sheer speed with which a large number of payments can be transacted over the Internet (volume and velocity).

Also, NACHA maintains a list of banned merchants engaged, or suspected to be engaged, in illegal activities called the Terminated Originator Database ("TOD"). The TOD regularly included Payday Lenders or third-party payment processors operating on their behalf.

F. Efforts by New York State and Federal Regulatory Agencies to Combat Illegal Payday Lenders

In 1999, Elizabeth McCaul, then-Acting Superintendent of Banks for The Banking Department of the State of New York, predecessor to the DFS, issued an "All Institution" industry letter warning banks and other lenders that out-of-state companies may be making Payday Loans over the Internet, thereby violating New York law.

In June 2000, McCaul sent another industry letter again warning banks and consumers about Payday Loans. The letter noted that the Banking Department contacted one company that had been offering payday loans in New York and secured the company's agreement to immediately stop accepting applications for Payday Loans from New York State residents.

In 2004, the New York State Attorney General took actions against four Payday Lenders that had been making usurious loans to New York residents. Those Payday Lenders ultimately were ordered by a court to stop making usurious payday loans in New York or agreed to do so. In an associated press release, the Attorney General commented: "[p]ayday lending can be the modern equivalent of loan sharking and . . . this office [would] continue to take aggressive action to stop payday lenders from victimizing New York consumers." (Id. at ¶ 76.)

In 2009, the New York State Attorney General secured a $5.2 million settlement from two out-of-state Illegal Payday Lenders that agreed to provide refunds to more than 14,000 New York consumers who were victimized as well as additional monies in penalties and costs.

In February 2013, Governor Andrew Cuomo announced that the DFS sent letters to all debt collectors in New York stating that it is illegal to attempt to collect a debt on a Payday Loan

8

since such loans are illegal in New York. The letters stated: "This notice is to remind all persons and entities collecting debts in New York that they should not seek to collect on illegal, usurious loans made in New York, including payday loans" and "[t]his includes illegal, usurious payday loans made in New York over the Internet and via phone and mail." (Id. at ¶ 77-78.)

In August 2013, the New York State Attorney General filed a lawsuit against three Payday Lenders and their owners, alleging that they violated usury laws by making loans that carry annual interest rates of between 89% and 335%. The lawsuit alleged that the three Payday Lenders made almost 18,000 loans to New York borrowers totaling $38 million in principal since 2010, on which the borrowers owed more than $185 million in finance charges.

In addition, at least six federal agencies, including the U.S. Department of Justice ("DOJ"), the Consumer Protection Financial Bureau ("CFPB"), and the Federal Trade Commission ("FTC"), are currently coordinating an extensive investigation regarding the online Payday Lending industry. At the time the complaint was filed in this case, the DOJ had issued civil subpoenas to more than fifty financial companies, including banks and payment processors that connect borrowers with online lenders.

Also, in 2013, the Federal Deposit Insurance Corporation announced that it had audited banks with relations to Payday Lenders and told banks working with these lenders that these lenders posed a 'reputational risk that could harm the banks' safety and soundness." (Id. at ¶84.)

G. The Defendant's Financial Interests in the Payday Lending Industry

The Plaintiff alleges that because Payday Lenders do not have bank charters, their business model is based on high levels of loss and high customer acquisition costs, requiring access to significant lines of credit. Major banks such as the Defendant provide these lines of credit to Payday Lenders.

9

The Plaintiff also alleges that individuals with ties to the Defendant sit on the Boards of Directors of at least three of the nation's largest Payday Lenders.

Finally, the Plaintiff asserts that although the Defendant announced that it would stop funding Payday Lenders, "[the Defendant]'s long-term financing of Illegal Payday Lenders has allowed it to reap hundreds of millions, if not billions, of dollars in interest income at the expense of their own customers such as the Plaintiff." (Id. at ¶ 93.)

H.  The Plaintiff's Online PayDay Loans

1.  The Mambo Cash Transactions

On May 4, 2013, the Plaintiff applied for and received a Payday Loan in the amount of $500 from Mambo Cash by completing an application over the Internet.  The entirety of the interest plus principal, which equaled $625, was due 11 days from the date of the loan.  Thus, the nominal annual interest on the loan was at least 1,277.5%.

On June 21, 2013, Mambo Cash initiated a debit transaction of $175.75 from the Plaintiff's checking account in New York through the ACH Network.  The payment was processed as a debit by the Defendant resulting in the Defendant taking this amount from the Plaintiff's account.  The payment applied solely to interest and did not reduce the amount of the Plaintiff's $500 debt.

Mambo Cash's frequent debits of the Plaintiff's checking account with the Defendant caused the Plaintiff's account to enter into a negative balance.  Consequently, the Defendant charged the Plaintiff overdraft fees at the time of or shortly after processing Mambo Cash's debits.

On July 5, 2013, Mambo Cash initiated a debit transaction of $148.75 from the Plaintiff's checking account with the Defendant in New York.  The payment was processed as a debit

resulting in the Defendant taking this amount from the Plaintiff's account. As a result, the Plaintiff was charged by and paid to the Defendant a "non-sufficient funds" returned item fee of $35.

2. The North Cash Transactions

On May 17, 2013, the Plaintiff applied for and received a payday loan in the amount of $400 from North Cash by completing an application on the Internet. The entirety of the interest plus principal, which equaled $3,220, was scheduled to be paid over the course of 35 bi-weekly payments. Thus, the nominal annual percentage rate on the loan was at least 803.6%.

On May 29, 2013, North Cash initiated a debit transaction of $178.34 from the Plaintiff's checking account with the Defendant in New York through the ACH Network. The payment was processed as a debit resulting in the Defendant taking this amount from the Plaintiff's account. The payment was applied solely to interest and did not reduce the amount of the Plaintiff's $400 debt.

North Cash's frequent debits of the Plaintiff checking account with the Defendant caused the Plaintiff's account to enter into a negative balance. Consequently, the Defendant charged the Plaintiff overdraft fees at the time of or shortly after processing North Cash's debits.

On July 12, 2013, North Cash initiated a debit transaction of $178.34 from the Plaintiff's checking account in New York. The payment was processed as a debit resulting in the Defendant taking this amount from the Plaintiff's account. Therefore, on July 15, 2013, the Plaintiff was charged by and paid to the Defendant an NSF returned item fee of $35.

3. The GTI Holdings Transactions

On May 22, 2013, the Plaintiff applied for and received a payday loan in the amount of $250 from GTI Holdings by completing an application over the Internet. The entirety of the

interest plus principal, which equaled $325, was due 20 days from the date of the loan. Thus, the nominal annual interest on the loan was at least 547.5%.

On June 14, 2013, GTI Holdings initiated a debit transaction of $75 from the Plaintiff's checking account with the Defendant in New York through the ACH Network. The payment was processed as a debit resulting in Defendant taking this amount from the Plaintiff's account. The payment applied solely to interest and did not reduce the amount of the Plaintiff $250 debt.

GTI Holdings' frequent debits of the Plaintiff's checking account with the Defendant caused the Plaintiff's account to enter into a negative balance. Consequently, the Defendant charged the Plaintiff overdraft fees at the time of or shortly after processing GTI Holdings' debits.

On June 28, 2013, GTI Holdings initiated a debit transaction of $75 from the Plaintiff's checking account with the Defendant in New York. The payment was processed as a debit by the Defendant resulting in the Defendant taking this amount from the Plaintiff's account. As a result, the Plaintiff was charged by and paid to the Defendant an overdraft item fee of $35 on July 1, 2013.

4. The United Holdings Transactions

On June 10, 2013, the Plaintiff applied for and received a payday loan in the amount of $300 from United Holdings by completing an application over the Internet. The entirety of the interest plus principal, which equaled $390, was due 21 days from the date of the loan. Thus, the nominal annual interest on the loan was at least 730%.

On June 28, 2013, United Holdings initiated a debit transaction of $90 from the Plaintiff's checking account with the Defendant in New York through the ACH Network. The payment was processed as a debit resulting in the Defendant taking this amount from the

Plaintiff's account. The payment applied solely to interest and did not reduce the amount of the Plaintiff $300 debt.

United Holdings' frequent debits of the Plaintiff's checking account with the Defendant caused the Plaintiff's account to enter into a negative balance. Consequently, the Defendant charged the Plaintiff overdraft fees at the time of or shortly after processing United Holdings' debits.

On July 15, 2013, United Holdings initiated a debit transaction of $90 from the Plaintiff's checking account with the Defendant in New York. The payment was processed as a debit resulting in the Defendant taking this amount from the Plaintiff's account. As a result, on July 16, 2013, the Plaintiff was charged by and paid to the Defendant an NSF returned item fee of $35.

5. The Hydra Fund Transactions

On June 6, 2013, the Plaintiff applied for and received a payday loan in the amount of $400 from Hydra Fund by completing an application over the Internet. The entirety of the interest plus principal, which equaled $520, was due about 23 days from the date of the loan. Thus, the nominal annual interest on the loan was at least 497.73%.

On June 28, 2013, Hydra Fund initiated a debit transaction of $120 from the Plaintiff's checking account with the Defendant in New York through the ACH Network. The payment was processed as a debit resulting in the Defendant taking this amount from the Plaintiff's account. The payment applied solely to interest and did not reduce the amount of the Plaintiff's $400 debt.

Hydra Fund's frequent debits of the Plaintiff's checking account with the Defendant caused the Plaintiff's account to enter into a negative balance. Consequently, the Defendant charged the Plaintiff overdraft fees at the time of or shortly after processing Hydra Fund's debits.

On July 12, 2013, Hydra Fund initiated a debit transaction of $120 from the Plaintiff's checking account with the Defendant in New York. The payment was processed as a debit resulting in the Defendant taking this amount from the Plaintiff's account. As a result, on July 15, 2013, the Plaintiff was charged by and paid to the Defendant an NSF returned item fee of $35.

6. The Mass Street Transactions

On June 6, 2013, the Plaintiff applied for and received a payday loan in the amount of $300 from Mass Street by completing an application over the Internet. The entirety of the interest plus principal, which equaled $390 was due 23 days from the date of the loan. Thus, the nominal annual interest on the loan was at least 782.14%.

On June 28, 2013, Mass Street initiated a debit transaction of $90 from the Plaintiff's checking account in New York through the ACH Network. The payment was processed as a debit resulting in the Defendant taking this amount from the Plaintiff's account. The payment applied solely to interest and did not reduce the amount of the Plaintiff's $300 debt.

Mass Street Group's frequent debits of the Plaintiff's checking account with the Defendant caused the Plaintiff's account to enter into a negative balance. Consequently, the Defendant charged the Plaintiff overdraft fees at the time of or shortly after processing Mass Street Group's debits.

On July 26, 2013, Mass Street initiated a debit transaction of $90 from the Plaintiff checking account with the Defendant in New York. The payment was processed as a debit

14

resulting in the Defendant taking this amount from the Plaintiff account. As a result, the Plaintiff

was charged by and paid to the Defendant an NSF returned item fee of $35.

I. Procedural History

As noted above, on July 2, 2014, the Plaintiff commenced this class action. The

proposed class is defined as "[a]ll BofA account holders in New York whose accounts, within

the last six (6) years preceding the filing of this action to the date of class certification, were

debited for Illegal Payday Loans." (Compl., at ¶125.)

The Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(d)(2)

and (6) of the Class Action Fairness Act of 2005.

On September 15, 2014, the Defendant moved pursuant to Rule 12(b)(6) to dismiss the

complaint for failure to state a claim upon which relief can be granted.

## II.      DISCUSSION

A.  The Rule 12(b)(6) Standard

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a

complaint for "failure to state a claim upon which relief can be granted." To survive a Rule

12(b)(6) motion to dismiss, a plaintiff must provide grounds upon which their claim rests

through "factual allegations sufficient 'to raise a right to relief above the speculative level.'"

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)). In other

words, the complaint must allege "enough facts to state a claim to relief that is plausible on its

face." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly,

550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010)(citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)). "Where a document is not incorporated by reference, the court may [nevertheless] consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." DiFolco, 622 F.3d at 111 (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).

B.  The Breach of Contract Claim

"In New York, a claim for breach of contract requires proof of: '(1) a valid contract; (2) plaintiff's performance; (3) defendant's failure to perform; and (4) damages resulting from the breach.'" In re Scotts EZ Seed Litig., No. 12 CV 4727 (VB), 2015 WL 670162, at *10 (S.D.N.Y. Jan. 26, 2015)(quoting Macaluso v. U.S. Life. Ins. Co., No. 03 Civ. 2337 (GEL), 2004 WL 1497606, at *3 (S.D.N.Y. July 2, 2004)(citing Furia v. Furia, 116 A.D.2d 694, 695, 498 N.Y.S.2d 12 (2d Dep't 1986)).

Here, the parties dispute whether the Plaintiff has properly plead a breach of the Account Agreement.  As noted above, the Plaintiff alleges that her "Account Agreement incorporated NACHA Rules, promising accountholders that all ACH transactions would be processed strictly in accordance with the [NACHA] rules and procedures." (Compl. at ¶ 137.)  She also alleges that the NACHA Rules "require BofA to block [ACH] transactions [that] it knows to be unlawful or

unauthorized under [the] NACHA Rules." (<u>Id.</u> at ¶¶ 30-32, 138.)  The Plaintiff also alleges that

the NACHA Rules required the Defendant to recredit customers' accounts to the extent that it

honored ACH debits on Payday Loans that were in violation of applicable "Legal

Requirements," including New York law. (<u>Id.</u> at ¶ 35.)  Finally, the Plaintiff alleges that the

Defendant violated her Account Agreement by assessing overdraft and return item fees on ACH

payments on Payday Loans that were unlawful or unauthorized under the NACHA Rules.

In the Court's view, these allegations misconstrue the Account Agreement for a number

of reasons.

First, with respect to the Plaintiff's allegation that the Defendant promised to process

ACH debits to her deposit accounts strictly in accordance with the NACHA Rules, the Plaintiff

relies on the NACHA Clause, which, as noted above, provides:

> From time to time, originators that you authorize may send automated clearing
> house (ACH) credits or debits for your account.  For each ACH transaction, you
> agree that the transaction is subject to the National Automated Clearing House
> Association (NACHA) Operating Rules and any local ACH operating rules then
> in effect.

(Account Agreement, at 45.)

This provision, which is an acknowledgement from the accountholder, rather than from

the Defendant, is contained in a subsection entitled "ACH Debits and Credits," which is part of a

section entitled "Funds Transfer Services."  The section "Funds Transfer Services" states that it

does "not apply to transaction governed by Regulation E . . . ." <u>Id.</u>  ACH debits to consumer

deposit accounts are subject to Regulation E. <u>See</u> 12 C.F.R. 1005.3(a)(Regulation E encompasses

"any electronic fund transfer that authorizes a financial institution to debit or credit a consumer's

account.").  Therefore, even assuming that the NACHA Clause obligated the Defendant to

comply with NACHA Rules, the NACHA Clause is inapplicable to the transactions at issue in this case.

Nevertheless, the Plaintiff argues that the NACHA Clause applies to her ACH transactions because (i) that clause also contains a sentence providing that the NACHA Rules apply to ACH transactions "notwithstanding any choice of law . . . provided elsewhere in this agreement" and (ii) the sentence that states that the "Funds Transfer Services" section does not apply to transactions to which Reg. E applies is such a "choice of law" provision. The Court disagrees.

Plainly read, the language relied upon by the Plaintiff merely provides that, for non-consumer accounts subject to the "Funds Transfer Services" section, the NACHA Rules apply to transactions processed in the ACH network "notwithstanding" any "choice of law" provision elsewhere in the Account Agreement. It thus "saves" the application of the NACHA Rules, but only for non-consumer transactions. In other words, nothing in the language relied upon by the Plaintiff indicates that the "Funds Transfer Services" section applies to consumer ACH transactions or that the Defendant must will comply with the NACHA Rules for consumer ACH transactions. Again, the "Funds Transfer Services" section, including the "choice of law" sentence, is irrelevant to the Plaintiff's ACH transactions because that section does not apply to ACH debits to consumer accounts like hers.

Second, even assuming the NACHA clause obligated the Defendant to comply with NACHA rules with respect to ACH debits on consumer accounts like the Plaintiffs, the Plaintiff's breach of contract claim fails for the additional reason that the "Funds Transfer Services" section states that RDFIs such as the Defendant may rely on the representations of the Original Depository Financial Institutions ("ODFIs"), the bank that processes the ACH debit for

the Payday Lender.  In particular, the ODFI represents that the ACH debit is authorized and may debit the Plaintiff's account as instructed by the originator of the ACH transaction.  In particular, NACHA Rules 2.3.2.3 and 2.4.1.1 provide that the ODFI is responsible for the valid authorization of every ACH debit processed in its name.  Therefore, the ODFI warrants to the RDFI that the ACH debit was properly authorized by the Receiver in accordance with the NACHA rules. Id.; NACHA Rule 2.4.1.2.  Accordingly, the ACH "Debits and Credits" subsection, to the extent it applied to the Plaintiff's account, provided that the Defendant could rely on that representation and debit the Plaintiff's account as directed. See Affinion Benefits Group, LLC v. Econ-ocheck Corp., 784 F. Supp. 2d 855, 876 (M.D. Tenn. 2011)("Because the consumer's bank . . . itself has no direct relationship with the Originator or the Originator's bank, the consumer's bank relies on a series of warranties received from the Originator through its bank that it has received proper authorization from the consumer before initiating a debit."); Atkins v. Wachovia Bank, N.A., No. 0948, 2007 Phila. Ct. Com. Pl. LEXIS 341, at *17 (Pa. Super. Ct. Dec. 4, 2007)( "Plaintiff agreed, with respect to ACH transactions, to be bound by NACHA Operating Rules and, as set forth in said rules, to allow [the RDFI] to rely on the, representations and warranties of the originator of an ACH entry.").

Third, even assuming that (1) the NACHA clause obligated the Defendant to comply with NACHA Rules with respect to ACH debits on consumer accounts like that of the Plaintiff and (2) the Defendant could not rely on representations from ODFIs for purposes of complying with the NACHA Rules, the Defendant was not required to unilaterally block or recredit payments that were authorized in connection with transactions that the Plaintiff alleges were unlawful.

Of relevance here, the NACHA Rules require RDFIs, like the Defendant, to honor all debits presented subject to a right of return. NACHA Rule 3.1.1; Affinion Benefits Group, LLC,

784 F. Supp. 2d at 876 (RDFIs must honor ACH debits based on the warranties provided by the ODFI and the Originator); <u>Atkins</u>, 2007 Phila. Ct. Com. Pl. LEXIS 341, at *17 ("pursuant to NACHA Operating Rules . . . the RDFI, <u>must</u> accept credit, debit and zero dollar transactions with respect to accounts maintained with them.")

     To be sure, Section 3.11 of the NACHA Rules states that "[a]n RDFI must recredit the accountholder [1] for a debit Entry that was, in whole or in part, not properly authorized under these Rules, [2] as required by these Rules, applicable Legal Requirements, or agreement between the RDFI and the account holder." However, the Plaintiff does not allege that the ACH debits to her account were not authorized as provided in the NACHA Rules. An authorization is invalid under the NACHA Rules in connection with an illegal transaction only if the illegality invalidated the authorization provided by the Plaintiff. <u>See</u> NACHA Rule 2.3.2.3. The Plaintiff alleges that the Payday Loan transactions were illegal, but she does not allege that such illegality invalidated her authorization under applicable law. This is fatal to the Plaintiff's claim that Section 3.11 required the Defendant to recredit her account.

     Having concluded that the Defendant was not obligated to block or recredit transactions, it follows that the Defendant may not be liable as a matter of contract for overdraft and returned item fees in connection with such transactions.

     Further, even if the Plaintiff could establish that a violation of law invalidated her authorization to initiate ACH debits, she has not alleged that the Defendant was required to recredit her account under any of the NACHA Rules, applicable Legal Requirements (as defined in Rule 8.49) or the Account Agreement. NACHA Rule 3.11.1 provides: "An RDFI must promptly recredit the amount of a debit Entry to a Consumer Account of a Receiver . . . <u>if it receives notification from the Receiver</u> in accordance with Section 3.12 . . . ." (emphasis added).

Here, the complaint does not allege that the Plaintiff notified the Defendant that the ACH transactions were unauthorized or requested that the transactions be recredited. Similarly, the Plaintiff does not and cannot plausibly allege that the Defendant was required to recredit her account under applicable Legal Requirements or the Account Agreement.

The fact that requiring this type of authorization may frustrate the goal of preventing illicit payments from entering the ACH Network in cases where accountholders themselves are actively attempting to engage in illicit payments must give way to the plain terms of the NACHA Rules 3.11, assuming, of course, they even apply to the subject transactions.

For these reasons, the Court finds that the Plaintiff's breach of contract claim fails as a matter of law and grants that part of the Defendant's motion to dismiss that claim.

C. The Breach of the Covenant of Good Faith and Fair Dealing Claim

In New York, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig., 1 F. Supp. 3d 34, 51 (E.D.N.Y. 2014) on reconsideration sub nom. In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig., 14 F. Supp. 3d 99 (E.D.N.Y. 2014). Encompassed within the implied obligation of each promisor to exercise good faith are "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995)(internal citations and quotation marks omitted).

"Ordinarily, the covenant of good faith and fair dealing is breached where a party has complied with the literal terms of the contract, but has done so in a way that undermines the purpose of the contract and deprives the other party of the benefit of the bargain." Bi–Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York, 10 N.Y.3d 187, 198, 856 N.Y.S.2d 505, 886

N.E.2d 127 (2008). "The duty of good faith and fair dealing, however, is not without limits, and no obligation can be implied that would be inconsistent with other terms of the contractual relationship." Dalton, 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (internal quotation marks omitted); see also Suthers v. Amgen Inc., 441 F. Supp. 2d 478, 485 (S.D.N.Y. 2006).

Here, the Court notes that the Account Agreement expressly insulates the Defendant from liability for permitting withdrawals from the Plaintiff's account provided those withdrawals are permitted under the terms of the Account Agreement. (Account Agreement, Some General Terms" in "Account Ownership" Section, at 45.) On the Plaintiff's allegations, as previously determined, the Defendant did not, violate any express terms of the Account Agreement when it honored ACH debits that the Plaintiff authorized the Payday Lenders to initiate. Therefore, the Court grants that part of the Defendant's motion to dismiss the Plaintiff's claim for breach of the covenant of good faith and fair dealing.

Alternatively, the Court notes that a breach of this implied covenant is "merely a breach of the underlying contract," not a separate cause of action. MeehanCombs Global Credit Opportunities Funds, LP v. Caesars Entm't Corp., No. 14-CV-7091 (SAS), 2015 WL 221055, at *4 (S.D.N.Y. Jan. 15, 2015)(citations and quotation marks omitted). "'[I]f the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.'" Id.

In this case, the Plaintiff alleges that the Defendant violated its contractual duty to act in good faith by abusing its contractual discretion to process transactions and charge overdraft fees. The Plaintiff points to the following provision of the Account Agreement:

> If at any time we believe that your account may be subject to irregular, unauthorized, fraudulent, or illegal activity, we may, in our discretion freeze the

> funds in the account and in other accounts you maintain with us, without any liability to you, until such time as we are able to complete our investigation of the account and transactions.

(Account Agreement, "Freezing Your Account" Section, at 34.)

Contrary to the Plaintiff's contention, the Court finds that the claim for breach of the covenant of good faith and fair dealing is duplicative of the breach of contract claim. This is because the alleged underlying facts and conduct supporting the breach of contract claim – namely, that the Defendant honored ACH debits originated by illegal payday lenders and assessed overdraft and/or returned item fees as a result – underlies the Plaintiff's claim for breach of the covenant of good faith and fair dealing. For that matter, the fact that the Plaintiff relies on a particular provision of the Account Agreement to support its claim for breach of the covenant of good faith and fair dealing lends support to the Court's conclusion that this claim is, in fact, a breach of contract claim by another name.

For these reasons, the Court dismisses the Plaintiff's claim for breach of the covenant of good faith and fair dealing.

D. The Unconscionability Claim

The Plaintiff also alleges that the Defendant's imposition of "overdraft and returned item fees generated solely as a result of its honoring of illegal and unenforceable transactions on Illegal Payday Loans" are "unconscionable policies and practices." (Compl., at ¶ 151 a-e). However, the Plaintiff's attempt to convert the doctrine of unconscionability into an affirmative claim for relief must be rejected. See Guardian Life Ins. Co. of Am. v. Liberty Wealth Strategies, LLC, No. 13-CV-2047 (JPO), 2014 WL 3715386, at *3 (S.D.N.Y. July 28, 2014)(describing the doctrine of unconscionability under New York law as an affirmative defense); Knox v. Countrywide Bank, 4 F. Supp. 3d 499, 513 (E.D.N.Y. 2014)(dismissing a

cause of action based on unconscionability); <u>Ng v. HSBC Mortgage Corp.</u>, No. 07–CV5434 (RRM)(VVP), 2011 WL 3511296, at *8 (E.D.N.Y. Aug. 10, 2011) ("Under New York law, unconscionability is an affirmative defense to the enforcement of a contract . . . . A cause of action for unconscionability may not be used to seek affirmative relief."); <u>Tokio Marine v. Macready</u>, 803 F. Supp. 2d 193, 199 (E.D.N.Y. 2011)(same). The single case relied upon by the Plaintiff, <u>Checking Account Overdraft Litig.</u>, 694 F. Supp. 2d 1302, 1318-19 (S.D. Fla. 2010)), did not apply New York law.

Therefore, this claim, whether based on substantive or procedural unconscionability grounds, is dismissed.

E. The Conversion Claim

In New York, "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." <u>Colavito v. New York Organ Donor Network, Inc.</u>, 8 N.Y.3d 43, 49–50, 827 N.Y.S.2d 96, 860 N.E.2d 713 (2006). "Money, specifically identifiable and segregated, can be the subject of a conversion action." <u>Manufacturers Hanover Trust Co. v. Chem. Bank</u>, 160 A.D.2d 113, 124, 559 N.Y.S.2d 704 (1st Dep't 1990). A plaintiff need not show that he or she holds title to the property in question. He or she need only establish "(1) [a] possessory right or interest in the property; and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." <u>Colavito</u>, 8 N.Y.3d at 50, 827 N.Y.S.2d 96, 860 N.E.2d 713 (citations and quotation marks omitted).

"Money deposited in a general account at a bank does not remain the property of the depositor. Upon deposit . . . the money deposited becomes the property of the depositary bank; the property of the depositor is the indebtedness of the bank to it. . . ." <u>Law Offices of K.C.</u>

Okoli, P.C. v. BNB Bank, N.A., 481 Fed. Appx. 622, 627 (2d Cir. 2012)(applying New York law)(citations and quotation marks omitted); see also In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig., 1 F. Supp. 3d at 53. Thus, depositors like the Plaintiff cannot bring a conversion cause of action under New York law against the Defendant, her bank, as the funds deposited therein "are not sufficiently specific and identifiable, in relation to the bank's other funds, to support" such a claim. Fundacion Museo de Arte Contemporaneo de Caracas v. CBI–TDB Union Bancaire Privee, 160 F.3d 146, 148 (2d Cir. 1998)(per curiam). Accordingly, the Plaintiff's claim for conversion is dismissed.

In any event, a claim for conversion "cannot be predicated on a mere breach of contract." Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P., No. 08CI. 10578 (RJS), 2010 WL 1257326, at *9 (S.D.N.Y. Mar. 12, 2010)(citation omitted). "Rather, to state a claim for conversion, a plaintiff must allege 'independent facts sufficient to give rise to tort liability.'" Id. (citations omitted).

Here, the Court finds that the Plaintiff's conversion claim is simply a restatement of the breach of contract claim based on the Defendant's assessment of overdraft fees. Thus, there is no basis for a claim that the Defendant violated an independent tort duty owed to the Plaintiff.

F.  The Unjust Enrichment Claim

Under New York law, an unjust enrichment claim is a quasi-contract claim. As such, this claim generally exists only where there is no express agreement between the parties. See Valley Juice Ltd., Inc. v. Evian Waters of France, Inc., 87 F.3d 604, 610 (2d Cir. 1996)("Under New York law, '[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same

subject matter.'")(citation omitted); <u>D'Amato v. Five Star Reporting, Inc.</u>, No. 12-CV-3395

(ADS)(AKT), 2015 WL 248612, at *23 (E.D.N.Y. Jan. 17, 2015)(citing <u>Valley Juice Ltd., Inc.</u>).

Here, the Account Agreement defines the rights of the parties. Nevertheless, the Plaintiff

insists that she may plead both breach of contract and unjust enrichment claims in the alternative

and that she need not elect their remedies at this stage of the litigation. In <u>Plumitallo v. Hudson</u>

<u>Atl. Land Co.</u>, LLC, 74 A.D.3d 1038, 1039, 903 N.Y.S.2d 127 (2d Dep't 2010), the court held

that a plaintiff would not be required to elect his or her remedies only where, unlike here, "there

is a bona fide dispute as to the existence of a contract, or where the contract does not cover the

dispute in issue." <u>Id.</u>; <u>In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.</u>, 1 F. Supp.

3d. at 53-54 (distinguishing <u>Plumitallo</u>); <u>cf.</u> <u>Worldcare Int'l, Inc. v. Kay</u>, 119 A.D.3d 554, 989

N.Y.S.2d 495, 497 (2d Dep't 2014)("Since there is a bona fide dispute as to the validity and

enforceability of the employment manual as a contract, the plaintiffs are not required to elect

their remedies . . ."); <u>see</u> <u>M/A-Com, Inc. v. State</u>, 78 A.D.3d 1293, 1294, 910 N.Y.S.2d 246, 247

(3d Dep't 2010)("If, however, there is a bona fide dispute as to the existence of a contract or

whether the scope of an existing contract covers the disagreement between the parties, a party

will not be required to elect his or her remedies and may proceed on both quasi contract and

breach of contract theories.").

Absent the circumstances stated above, the Court dismisses the Plaintiff's claim for

unjust enrichment under New York law.

G. <u>The General Business Law § 349(a) Claim</u>

"To state a claim under Section 349 [of the General Business Law], a plaintiff must

allege: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a

material respect; and (3) the plaintiff was injured as a result." <u>Spagnola v. Chubb Corp.</u>, 574 F.3d

64, 74 (2d Cir. 2009); see also In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig., 1

F. Supp. 3d at 54 (reciting elements of a § 349 cause of action).

"The scope of Section 349 is notably broad in three important respects. First, claims

brought under Section 349 are not subject to the heightened pleading requirements set forth in

Rule 9(b). Second, to state a claim under Section 349, plaintiffs need not allege they relied on

defendants' misrepresentations. Third, plaintiffs need not plead defendants knew or should have

known the alleged statements were false or misleading." Quinn v. Walgreen Co., 958 F. Supp. 2d

533, 543 (S.D.N.Y. 2013)(internal citations omitted).

Here, while the Plaintiff has plausibly alleged consumer-oriented conduct based on an

Account Agreement the Defendant uses with all of its deposit account customers, Makuch v.

New York Cent. Mut. Fire Ins. Co., 12 A.D.3d 1110, 1110, 785 N.Y.S.2d 236, 238 (4th Dep't

2004)("the allegations that the forms making up plaintiffs' insurance policy are standard and

regularly used by defendant are sufficient to support the allegation that defendant's actions are

consumer-oriented . . ."), the conduct of which she complains is essentially that the Defendant

failed to satisfy its contractual duties, not that it concealed or misrepresented any contractual

terms. See Lucker v. Bayside Cemetery, 114 A.D.3d 162, 175, 979 N.Y.S.2d 8, 18 (1st Dep't

2013)(dismissing a § 349 claim), leave denied, 24 N.Y.3d 901, 995 N.Y.S.2d 709 (2014).

For this reason, the Court dismisses the Plaintiff's § 349 claim.

### III. CONCLUSION

It is true that New York's high court has explained that "from time immemorial,

[governments have sought to] protect desperately poor people from the consequences of their

own desperation. Law-making authorities in almost all civilizations have recognized that the

crush of financial burdens causes people to agree to almost any conditions of the lender and to

consent to even the most improvident loans." Schneider v. Phelps, 41 N.Y.2d 238, 391 N.Y.S.2d 568, 572, 359 N.E.2d 1361 (1977); see also Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs., 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013)(quoting Schnieder), aff'd, 769 F.3d 105 (2d Cir. 2014).   However, it does not follow that, on these allegations, the Plaintiff has a cause of action against RDFIs such as the Defendant, either under New York statutory or common law, based on the alleged failure of the Defendant to combat the practices of Payday Lenders.

Based on the foregoing reasons, the Court grants the Defendant's motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief can be granted.   The Clerk of the Court is respectfully directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
February 24, 2015


_    *Arthur D. Spatt*                                  _
    ARTHUR D. SPATT
United States District Judge